UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lola Annette Jeffries Daniels,

Plaintiff,

v.

Civ. No. 01-1673 (JEL/JGL)
ORDER

Scott D. Downing, individually and in his capacity as a Minneapolis Police Officer, John Doe, individually and in his capacity as a Minneapolis Police Officer, and the City of Minneapolis,

Defendants.

---

Frederick J. Goetz, Esq., Goetz & Eckland, P.A., appeared for Plaintiff Lola Annette Jeffries Daniels.

Peter W. Ginder, Esq., Assistant City Attorney, Office of the Minneapolis City Attorney, appeared for Defendants Scott D. Downing, John Doe, and City of Minneapolis.

---

Lola Annette Jeffries Daniels brought this action against two Minneapolis police officers and the City of Minneapolis (City), asserting claims under 42 U.S.C. § 1983 (2000), and claims under state law for false arrest, assault, battery, and intentional infliction of emotional distress. The action was removed from Minnesota state court, and is now before the Court on a Motion for Summary Judgment by the City and the officers, Scott D. Downing and John Doe.[1] For the reasons set forth below, the Court grants the motion in part and denies it in part.

## I. SUBJECT MATTER JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367(a), 1441(a) (2000).

---

[1] In her opposition to the motion, Daniels conceded that her claims against the unidentified officer, John Doe, should be dismissed. The Court therefore dismisses her claims against Doe.

FILED JAN 31 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED_______
DEPUTY CLERK'S INITIALS_______

## II. BACKGROUND

Daniels lives at 3600 Park Avenue South, Minneapolis, Minnesota, on the ground floor of a duplex that she owns. After experiencing problems with pigeons at the duplex, she called the University of Minnesota for advice and was informed that she could scare the pigeons away by shooting at them with a BB gun. She then bought a Marksman model 1717 BB gun. On the evening of January 22, 2001, Daniels, holding the gun, walked around the duplex and looked up at the roof to determine the best way to scare the pigeons away. According to Daniels, she neither aimed nor fired the gun at the duplex as she walked around it.

Meanwhile, Downing was driving home at the conclusion of his shift. Upon entering the Third Precinct, he switched his police radio to that precinct's dispatch channel and heard that 911 had received calls about a male armed with a rifle at 36th Street and Columbus Avenue. The dispatcher also broadcast a report of a black female aiming a BB gun or rifle at the second floor of 3600 Portland Avenue. Downing drove to the area to search for the suspect and saw an individual with a rifle standing on the sidewalk near 36th Street and Park Avenue, which is one block west of Columbus Avenue and two block east of Portland Avenue. Daniels and Downing vigorously contest what happened after he arrived on the scene.

According to Daniels, she was looking at her roof when she heard someone behind her shout at her to put the gun down. Holding the gun vertically as though it were a cane, with the butt touching the ground and the barrel directed skyward, she turned around, recognized that the individual shouting at her was a police officer, and saw that the officer, later identified as Downing, was pointing a pistol at her. Downing ordered her to put the gun down and she threw it on a snowbank. He told her to back away from the gun and she complied, moving at least three car lengths away from it. He directed her to put her hands up and she did so. Downing picked up the

gun from the snowbank, and then threw it back. At Downing's request, Daniels turned around, kneeled on the sidewalk, and remained kneeling with her hands raised for approximately ten minutes while Downing spoke with other officers. Downing continued to speak with an individual after three or four squad cars left. Downing then approached Daniels from behind, slammed her face into the sidewalk, kneed her in the back, and twisted her arms behind her. At the same time, he said to her: "You fucking nigger. I could have killed you." Downing then handcuffed Daniels. She told him that she was diabetic and asked that he not handcuff her tightly because her wrists would swell. Downing ignored her request to loosen the handcuffs. Daniels was placed in the back of a squad car where she remained, handcuffed, for at least 20 minutes. After speaking with two officers and a sergeant, she was released.

Downing's version of the facts differs sharply from Daniels's. According to Downing, he saw Daniels aiming a rifle at the house on the corner of 36th Street and Park Avenue. After drawing his pistol and taking cover, Downing ordered Daniels to drop the gun. In response, Daniels turned and pointed the gun from her waist at Downing and another officer who had arrived. Downing told her that he would shoot her if she did not drop the gun. Daniels yelled, "It's just a BB gun." She eventually dropped the gun but did not comply with Downing's orders to back away from it. Instead, she turned away from the gun and kneeled down. Downing and the other officer ran to her and attempted to handcuff her. When Daniels tried to stand up, Downing and the other officer pushed her to the ground and handcuffed her. The officers placed Daniels in the back of a squad car and retrieved the gun. At that point, Downing realized that it was a BB gun. While Daniels was in the squad car, she said that her glasses had broken and Downing retrieved a lens that had popped out of her frames. After she stated the handcuffs were too tight, they were loosened and then removed.

Daniels spoke with a sergeant within five minutes of her being placed in handcuffs and was then released.

The next day, Daniels sought treatment at the HealthPartners Riverside Clinic for swelling and soreness in her face, neck, wrists, back, and knees. As a result of the incident, she has difficulty sleeping, and has experienced nightmares, crying episodes, and flash backs. She has sought treatment for these issues.

## III. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Section 1983 claims

Daniels asserts claims based on 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

> thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

Daniels alleges that Downing violated the Fourth Amendment by arresting her without probable cause and using unreasonable force during the arrest. Downing asserts that he is entitled to qualified immunity. The doctrine of qualified immunity protects state actors from civil liability when "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Faced with an assertion of qualified immunity, a court must first consider whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Only if a constitutional violation could be established should the court then consider whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

*1. Arrest without probable cause*

The Fourth Amendment guarantees the right to be free from arrest without probable cause. *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999). A law enforcement officer has probable cause to conduct a warrantless arrest if he has "knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The objective facts available to the officer at the time of the arrest determine whether probable cause exists. *Smithson v. Aldrich*, 235 F.2d 1058, 1064 (8th Cir. 2000).

Downing asserts that he did not violate the Fourth Amendment because he had probable cause to arrest Daniels for violating Minneapolis Code of Ordinances § 393.150, which states:

> No person shall fire off, discharge or explode any weapon or use any weapon against another, or attempt to engage in any such conduct, except when done in the lawful defense of person, property, home, or family, or in the necessary enforcement of laws, or for trap, skeet, or target shooting on premises owned or controlled by any duly incorporated social organization, or any licensed range for the purpose of target practice, or when ordered by military or police authority.

Section 393.150 also provides that "[w]hoever, with the intent to fire off, discharge or explode any weapon or use any weapon against another, does an act which is a substantial step toward, and more than preparation for, the completed crime is guilty of an attempt to engage in such conduct." Downing asserts that he had probable cause to arrest Daniels for violating section 393.150 because he saw Daniels holding what he thought was a rifle near 36th Street and Park Avenue shortly after hearing a report of an individual aiming a BB gun or rifle at the second floor of 3600 Portland Avenue.

Daniels argues that the Court should not consider events that occurred before Downing arrived to determine whether he had probable cause to arrest her. She relies on Minnesota's statutory prohibition of warrantless arrests for misdemeanors committed outside an officer's presence, *see* Minn. Stat. § 629.34, subd. 1 (2002), and the common law rule that an officer can conduct a warrantless arrest for a misdemeanor committed in his presence, *see Payton v. New York*, 445 U.S. 573, 590 n.30 (1980). Notwithstanding statutory prohibitions of warrantless arrests for misdemeanors committed outside an officer's presence, the Court rejects Daniels's argument because the Fourth Amendment does not prohibit such arrests. *See Woods v. City of Chicago*, 234 F.3d 979, 994-95 (7th Cir. 2000).

Taking the evidence in the light most favorable to Daniels, the Court assumes that Daniels neither aimed nor fired the BB gun[2] at the duplex. Nevertheless, a reasonable person who saw Daniels holding what appeared to be a rifle shortly after hearing the dispatch calls would believe that she had aimed the gun at the house, thereby taking a substantial step toward firing the gun. Because Downing had probable cause to arrest Daniels, she cannot establish that he violated the Fourth Amendment. Consequently, Downing is entitled to qualified immunity from this claim.

2. *Unreasonable force*

Claims that law enforcement officers used excessive force in the course of an arrest or an investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *see Winters v. Adams*, 254 F.3d 758, 765 (8th Cir. 2001). Whether an officer's use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Circumstances such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is resisting arrest or attempting to evade arrest by flight are relevant to the reasonableness of the officer's conduct. *Id.* "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

[2] The parties do not dispute that the BB gun is a "weapon" for purposes of section 393.150.

The Court will first discuss Downing's assertion of qualified immunity from Daniels's claim that he used unreasonable force when he pushed her to the sidewalk. The evidence, viewed in the light most favorable to Daniels, reveals that Daniels did not resist arrest, did not attempt to flee, and did not pose a threat to the officers or others. She obeyed every order given by Downing. She kneeled on the sidewalk, at least three car lengths away from the gun, with her hands raised for approximately ten minutes. Without warning, Downing approached her from behind, slammed her face into the sidewalk, and kneed her in the back. In light of these circumstances, the Court concludes that Downing's conduct was objectively unreasonable.

Because the Court has determined that Daniels could establish a violation of the Fourth Amendment, the Court must consider whether a reasonable officer, under the circumstances of this case, would have known that his conduct violated the Fourth Amendment. *See Saucier*, 533 U.S. at 201-02. "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* at 205. Given that Daniels had obeyed all of Downing's orders, had kneeled on the sidewalk with her hands raised for approximately ten minutes, and was at least three car lengths away from the gun, no reasonable officer would believe that the law permitted him to approach Daniels from behind, and, without warning, slam her face into the sidewalk and knee her in the back. The Court therefore concludes that Downing is not entitled to qualified immunity from Daniels's claim that he used unreasonable force when he pushed her to the sidewalk.

As to Daniels's claim that Downing used unreasonable force when he handcuffed her tightly, Downing again asserts that he is entitled to qualified immunity. The Court must first consider whether the evidence, taken in the light most favorable to Daniels, demonstrates that Downing

violated the Fourth Amendment. *See id.* at 201. The Court assumes that Daniels told Downing that she was diabetic and that her wrists would swell if he handcuffed her tightly, and that he ignored her request to loosen the handcuffs. Records of Daniels's visit to the HealthPartners Riverside Clinic on January 23, 2001, reveal that she experienced soft tissue swelling around both wrists. Daniels's complaints about the tightness of the handcuffs and the soft tissue swelling do not establish that Downing used unreasonable force. *See Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (noting plaintiff's failure to present medical records indicating he suffered long-term injury from handcuffs and stating that allegations of pain as a result of being handcuffed, without evidence of more permanent injury, are insufficient to support excessive force claim). Downing's alleged use of a racial epithet just before handcuffing Daniels does not transform what was otherwise a reasonable use of force into an unreasonable one because "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." *Graham*, 490 U.S. at 397. Because the evidence, taken in the light most favorable to Daniels, does not demonstrate that Downing violated the Fourth Amendment by tightly handcuffing her, the Court concludes that Downing is entitled to qualified immunity from this claim.

**B. State law claims**

Daniels's state law claims against Downing include false arrest, assault, battery, and intentional infliction of emotional distress. Downing asserts that he is entitled to summary judgment, either because the doctrine of official immunity bars Daniels's claims, or because she has failed to establish one or more elements of her claims. Under Minnesota law, a public official is entitled to official immunity from state law claims when the official is charged by law with duties that require the exercise of judgment or discretion. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990); *see Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 (Minn. 1999). Because a police officer's duties

are generally considered discretionary, the officer is ordinarily entitled to official immunity. *Kelly*, 598 N.W.2d at 664; *Johnson*, 453 N.W.2d at 42. Official immunity does not apply, however, if the officer acted with malice. *Kelly*, 598 N.W.2d at 664. The malicious wrong exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).

*1. False arrest*

The tort of false arrest consists of two elements: (1) an arrest by the defendant; and (2) the unlawfulness of such arrest. *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (Minn. 1974). Probable cause to arrest exists if the objective facts are such that under the circumstances a person of ordinary care and prudence would entertain an honest and strong suspicion that a crime has been committed. *State v. Horner*, 617 N.W.2d 789, 795 (Minn. 2000). Again, under Minnesota law, a police officer may arrest a person without a warrant for a misdemeanor only if the misdemeanor is committed in the officer's presence. Minn. Stat. § 629.34, subd. 1; *State v. Studdard*, 352 N.W.2d 413, 415 (Minn. 1984). An offense is committed in an officer's presence if the officer becomes aware of the acts as a result of his sensory perception and the officer infers that the acts constitute an offense. *Quimby v. State*, 351 N.W.2d 629, 632 (Minn. 1984); *Smith v. Hubbard*, 91 N.W.2d 756, 762 (Minn. 1958). Information obtained by a police officer as a result of acts committed in his presence can be imputed to another officer to satisfy the presence requirement of section 629.34, but information from a third party who is not a police officer cannot be so imputed. *State v. McDonnell*, 353 N.W.2d 678, 680 (Minn. Ct. App. 1984). An officer acting without a warrant must issue a citation to a person who is subject to arrest for a misdemeanor, "unless it reasonably appears to the officer that arrest is necessary to prevent bodily harm to the accused or another or further criminal conduct, or that there

is a substantial likelihood that the accused will fail to respond to a citation." Minn. R. Crim. P. 6.01, subd. 1(1)(a).

Downing first argues that Daniels was the subject of an investigative stop–that is, that Daniels was not arrested. An officer may conduct an investigative stop based on any articulable suspicion that is not the product of mere whim, caprice, or idle curiosity. *State v. Blacksten*, 507 N.W.2d 842, 846 (Minn. 1993). Downing had articulable suspicion to stop Daniels in that he saw her holding what appeared to be a rifle shortly after hearing the dispatch calls. Thus, Downing appropriately stopped and disarmed Daniels. *See State v. O'Neill*, 216 N.W.2d 822, 828 (Minn. 1974) ("If an officer making a reasonable investigatory stop has cause to believe that the individual is armed, he is justified in proceeding cautiously with weapons ready."). Although the initial stop was legal and provided a basis for Downing to detain Daniels while he investigated, *see Blacksten*, 507 N.W.2d at 846, he did not have unbridled discretion, *see State v. Wiegand*, 645 N.W.2d 125, 136 (Minn. 2002). The Court assumes for purposes of this motion that Downing slammed Daniels to the sidewalk and handcuffed her after she had kneeled with her hands raised for approximately ten minutes, and that she was then placed in a squad car for at least 20 minutes. Under these circumstances, Daniels could establish that she was arrested. *See Blacksten*, 507 N.W.2d at 846.

Downing next argues that Daniels cannot establish that her arrest was unlawful. For the reasons given in the analysis of Daniels's section 1983 claim for arrest without probable cause, the Court concludes that Downing had probable cause, under state law, to arrest Daniels for violating section 393.150. The inquiry into the lawfulness of Daniels's arrest does not end there, however, because state law restricts an officer's authority to make warrantless misdemeanor arrests. Assuming that Daniels neither aimed nor fired the gun at the duplex, that she was holding the gun like a cane when Downing arrived, and that she complied with his orders to drop the gun and to move away

from it, nothing took place in Downing's presence or the presence of other officers to violate section 393.150. The information relayed in the dispatch calls does not alter this conclusion because it came from third parties whose knowledge cannot be imputed to the police. Thus, Daniels's arrest violated Minn. Stat. § 629.34. Moreover, even if Daniels was subject to lawful arrest for violating section 393.150, the evidence, viewed most favorably to Daniels, does not indicate that an arrest was necessary to prevent her from hurting someone or engaging in further criminal conduct, or that there was a substantial likelihood that she would not respond to a citation. Downing pushed her to the sidewalk, handcuffed her, and placed her in a squad car *after* she had thrown down the gun, moved away from it, and kneeled on the sidewalk with her hands raised for approximately ten minutes. Thus, the arrest also violated Minn. R. Crim. P. 6.01, subd. 1(1)(a).

Downing also asserts that the doctrine of official immunity bars Daniels's claim. For the reasons stated above, and given that an arrest for a misdemeanor is *the exception* to the normal practice of issuing citations under Rule 6.01, the Court concludes that official immunity does not bar Daniels's false arrest claim.

*2. Assault*

Under Minnesota law, an assault is an unlawful threat to do bodily harm to another with present ability to carry the threat into effect. *Elwood v. County of Rice*, 423 N.W.2d 671, 679 (Minn. 1988); *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939). The display of force that accompanies the threat must be such as to cause the plaintiff reasonable apprehension of immediate bodily harm. *Dahlin*, 288 N.W. at 852. Downing argues that he is entitled to summary judgment on Daniels's assault claim because there is no evidence in the record of an unlawful threat or because of official immunity. Daniels maintains that an assault occurred in this case when Downing allegedly called her a racial epithet and told her that he could have killed her while he was pushing her to the

sidewalk. Taking the evidence in the light most favorable to Daniels, the Court concludes that Downing's statement could be interpreted as a malicious and unlawful threat to do bodily harm. The Court therefore denies the motion on Daniels's assault claim.

*3. Battery*

A battery is an intentional unpermitted offensive contact with another. *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980). Unreasonable force is an element of an action for battery against a police officer who made a lawful arrest. *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984). Downing argues that Daniels failed to produce evidence that he used unreasonable force and that he is entitled to official immunity. Even if the arrest was lawful, a reasonable jury could find that Downing used unreasonable force when he pushed her to the sidewalk and handcuffed her tightly, *see Paradise*, 297 N.W.2d at 155-56, and that he did so with malice. The Court therefore denies the motion on Daniels's battery claim.

*4. Intentional infliction of emotional distress*

Under Minnesota law, the tort of intentional infliction of emotional distress has four elements: (1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress was severe. *Kelly*, 598 N.W.2d at 663; *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). Severe emotional distress is distress that no reasonable person could be expected to endure. *Hubbard*, 330 N.W.2d at 439. A plaintiff bears a heavy burden of production regarding the severity of the mental distress. *Id.* Summary judgment is proper if a party fails to meet this high standard. *Jensen v. Walsh*, 609 N.W.2d 251, 253 (Minn. Ct. App. 2000), *rev'd on other grounds*, 623 N.W.2d 247 (Minn. 2001).

Downing argues *inter alia* that he is entitled to summary judgment because Daniels failed to submit sufficient evidence on the issue of severe emotional distress. Daniels's deposition testimony and her counselors' notes establish that she has nightmares, difficulty sleeping, crying episodes, and flash backs as a result of the incident on January 22, 2001. In addition, her counselors believe that she suffers from post-traumatic stress disorder. This evidence is insufficient to establish severe emotional distress. *See id.* at 254 (affirming summary judgment against plaintiffs who suffered depression, difficulty sleeping, anxiety, inability to concentrate, and nausea for failure to demonstrate severe emotional distress, notwithstanding psychologist's conclusion that plaintiffs suffered "a severe degree of acute emotional distress"); *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 57 (Minn. Ct. App. 1995) (affirming summary judgment against plaintiff who sought treatment for insomnia, crying spells, depression, and a fear of answering door and telephone for failure to demonstrate severe emotional distress); *Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 379 (Minn. Ct. App. 1984) (affirming summary judgment against plaintiff who experienced humiliation, embarrassment, depression, unsteady nerves, and insomnia, consulted physician about nervous condition, and consulted psychologist about stress). The Court therefore grants the motion on Daniels's intentional infliction of emotional distress claim.

## IV. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons state above, IT IS ORDERED THAT:

1. Defendants Downing, Doe, and City's Motion for Summary Judgment [Docket No. 9] is GRANTED IN PART and DENIED IN PART.

2. Plaintiff Daniels's claims against Defendant Doe are DISMISSED.

3. Count I of the Complaint is DISMISSED.

4. Count II of the Complaint is DISMISSED insofar as it alleges Defendant Downing used unreasonable force when he tightly handcuffed Plaintiff Daniels.

5. Count VII of the Complaint is DISMISSED.

Dated: January 30, 2003

JOAN ERICKSEN LANCASTER
United States District Judge